Delgado and we'll begin with Mr. Sample. Good morning, Your Honors. I may please the Court, Brandon Sample for Mr. Marco Delgado. There are two primary issues that I want to focus on this morning in my argument with the Court. First of all is with respect to the sufficiency of the evidence concerning counts 1 and 2 and the wire fraud charge in this case. We have asserted and we believe that the government did not put forth sufficient evidence to support the conviction on those counts. This is primarily because although the government introduced certain banking records that would purport to show transmission of the wires through the United States, the government did not give any evidence that explained what those documents actually meant. The government attempted to introduce that evidence through a custodian for Wells Fargo Bank and the District Court specifically disallowed the custodian from testifying as to the explanation of what those documents mean. The second issue is with respect to an objection that was made about testimony from an attorney by the name of Mace Miller who was in-house counsel for the corporation FGG and an objection was made that he should not be allowed to testify as an expert in the case. This, the underlying facts of the case, it partly involved a ... But how do you get past the invited error argument on Miller? On the invited error argument, Your Honor, we think that there's actually a very fine distinction at work here because there was a question by the prosecutor specifically, is there a series of paragraphs on page four, a recitation of what is in the Mexican Civil Code? That was the specific question and then Mr. Miller had testified that, yes, we don't believe that the questions that came out on cross or that were elicited by Mr. Delgado's counsel would, in that constitute invited error because there weren't specific questions about Mexican law or even in this instance whether or not those provisions of the Mexican Federal Civil Code were in fact provisions of the Mexican Federal Civil Code. I recognize that that's kind of a fine distinction given the holistic nature of the testimony that was elicited from Mr. Miller, but that's our demonstration that this is not invited error. We believe that further that once the objection was made, the district court specifically ruled the objection saying that he can tell us what it means to him as a lawyer. Of course, we think that that is projecting to the jury a big difference than what the government has asserted that he was there testifying purely as a fact witness as in-house counsel for the corporation and that when you combine that with the issue of Mexican law, the fact that Mr. Miller is not a Mexican attorney, doesn't have any capacity really to testify in that regard, that it was error for the district court to permit that line of questioning on redirect. Turning again back to . . . What specifically was, I don't know, unique about the questioning? Because a lot of it is connected to the fact that whatever your power of attorney, you shouldn't be going around stealing the money from the fiduciary relationship other person. I think that it went to the authority of Mr. Delgado to be able to make these types of changes as the court certainly . . . It's one thing to say I'm going to change from, I don't know, Bank of Mexico, but another thing to say I'm going to change the $23 million and just put it in my pocket. What country allows that under a power of attorney? I'm not an attorney that knows anything about Mexican law, so I can't speak to what the provisions and whether or not this would have been authorized under Mexican law. I understand the appearance of how that seems, but of course the issue was that Mr. Delgado did not trust the owner of FDG that this money was . . . the money that he was entitled to for negotiating the contract and giving FDG the ability to even make a bid for the equipment and for the services that he was trying to protect his interest in that process as well. Whether or not that is permitted under Mexican law is also part and parcel of the problem here that we have a witness, U.S.-based lawyer that doesn't know whether or not that is in fact permitted under Mexican law. As I indicated, I certainly appreciate the appearance of how that seems, but even I don't know whether or not that would be permissible under Mexican law. Turning to the sufficiency of the evidence issue, we were not able to identify any cases on this specific type of situation where you have evidence that's admitted, but the context of the evidence is not sufficient by its face and where there is no other testimony, no other evidence that's introduced that demonstrates that the transmission of this wire, the use of correspondence banks, what all that stuff means, that that's just not apparent from the face of those documents. I think that the district court got that right when that objection was made, but ultimately, when there was the motion for judgment and acquittal, the district court seemed to have perhaps misunderstood its prior ruling or misinterpreted it. We believe that because there was not enough evidence, there was no evidence actually presented showing what the meaning of those documents meant, that the government did not present sufficient evidence on Counts 1 and 2. Did the district court admit Governments Exhibit 43 and 43A? Yes. Yes, Your Honor. What exactly is it on the face of those documents that's missing? It's the explanation for what those documents actually mean, and the government has attempted to essentially make the connection that you see X on the documents that that is itself, by itself, sufficient to demonstrate that there was a transmission in interstate and international commerce, but as the district court was noting when it sustained the objection, it seems like you're, and I'm paraphrasing that, you're getting ready to explain what international banking means and what all this other kinds of stuff means, and I don't think it's fair to assume that the jury should just know that those documents, you know, mean what the government purports that they mean. Well, the documents reference a bank account in New York and a bank account in Turks and Caicos that's on the face of the document, and it's sent on letterhead from El Paso, Texas. Take the El Paso, Texas, and put that off to one side. Just focus on the two bank accounts. If you have two government exhibits, one of which says, please make this change to the contract, I'd like it to go from this New York account to this Turks and Caicos account, or vice versa, and then the government shows $20 million transferred between those two accounts, I'm not sure I understand what else you would need to be able to infer foreign commerce. We believe that the government needed, they needed to have an expert there to testify just simply about the international banking system and just explain that this is what a correspondent bank is, this is how this happens when money is transmitted internationally, it would go from this bank, this would be the intermediary, and then it would get to there. But why isn't what Judge Oldham is pointing to some evidence of that? Now, if you had put on an expert who said, well, a document that says New York means nothing or something like that, then maybe the government would have needed to come in with more on that. But why can't you just look at the face of these documents and say that a New York bank was involved with an El Paso this and that and the Turks and Caicos and so on? Why isn't that enough? I will believe that's enough for primarily the same reasons why the documents don't speak for themselves. Not allowing testimony, not allowing a person who simply knows about the document to be an expert to me is a separate question from whether the document itself supports something. What is your best case for the proposition that these documents do not support the conviction here? We've not been able to find any case in this type of situation where the do not provide sufficient evidence to be able to support the conviction. It was noted in the objection, or actually in the oral motion for judgment acquittal, that this was essentially like an issue of first impression by the defense counsel at the time. Why should we rule the way you're asking us to since it's a question of first impression? I'm not really understanding. You said we don't know about international banking, so how do we know it's any different from if I deposit money in Dallas and the document says they send it to New York, that that's what happened? We just believe it's too strong of an inference to assume those gaps in how that works in international banking. I'm guessing that the physical dollar these days seldom moves around. Maybe you have a few in the bucket there for the teller to hand you, but I'm sure all of this is tending to be virtual sending. What else are we going to show? We're not going to have somebody who can say, oh, yes, I went into the vault and pulled out $32 million and put it in a suitcase and flew to Turks and Caicos. We know that didn't happen. That's probably never going to happen. I don't think that changes, though, the international engagement when a New York bank sends to the Turks and Caicos, even if that's virtual or online or whatever the right term is. I appreciate the court's point. I don't think it's so much an issue of the virtuality of how money is transmitted internationally, it's the mechanics of it, and that in order for the government to have proven this, that they needed to just take that slight additional step to put some evidence on it that explains that transmission, that this is just not some commonly known idea that you transmit money and it goes through a correspondent bank and that correspondent bank does this with it and it gets sent elsewhere. What do you think happened that wouldn't be international? I'm sorry, Your Honor? What do you think happened that would not be international? I mean, I don't, I mean, do I believe that the wires? No, no, I'm just saying, you're saying that this is very ambiguous, we really don't know, so I'm trying to understand that by saying, okay, typically ambiguity is because it could be A or it could be B and this wasn't clear on that. So I understand what A is, is that it's international. Now I'm trying to understand B, what could have happened, given the evidence that is presented, what could have happened that would have been solely domestic or not international under the law that Mr. Delgado was convicted of? I think if you're looking at the face of the documents, all you see is just the name of a bank that's in the United States and that's it. I don't believe that that by itself is sufficient for the government to be able to demonstrate the requisite nexus in this type of case. Anything else that you'd like to argue? No, Your Honor. Okay. Thank you very much. I appreciate your argument. All right. We'll hear from the United States. Yes, Your Honor. Mark Stelmach, representing the United States. As Judge Oldham pointed out, one of the key documents here is document 43, and this is not, it's not a detailed bank record, it's a notarized statement from Delgado sent to Delgado, according to the contract, and requesting, quote, a modification be made as to the account number and the corresponding electronic transfer be made under the following banking instructions, unquote. And then in the second paragraph, it's just set out, Delgado directs that the wire, quote, be sent via Wachovia Bank in New York for initial credit to the First Caribbean Bank in the Turks and Caicos Island, and further credit to the Skippings Rutley dollar account, which was controlled by Delgado. And this was sent on March 3rd, and the $20 million wire followed these directions on March 9th. In the other exhibits, the wire notifications show that the ordering and sending institution was the Mexican National Bank of International Commerce. The sender's correspondent bank was Standard Chartered Bank, and an intermediate institution was Wachovia Bank of New York, and further, the exhibits from the First Caribbean Bank records, the credit devices, describe the, quote, the sender's institution, unquote, is Wachovia Bank. So how do you square up the district court's ruling about not testifying about how all this works with, but this is good enough, these exhibits are good enough? Well, yeah, the court thought that going into the international banking system and the rules of that was going into expert testimony. But when they took the position in the Rule 29 motion that this is the same thing, you've already disregarded the expert testimony, the court denied the motion, and the court looked at the exhibits, the exact same exhibits that were proposed to the jury and which are in our brief, and said that this is sufficient to show involvement with the New York banks and contact with the United States. So I guess my short answer is that he reversed himself at the end, at the Rule 29 hearing, and said it was, that the documents were sufficient. And jurors could find from words like sender, that they're not complicated terms, that the wire transfers involved the New York banks. And of course, they're instructed, jurors, to use their common sense and can make reasonable deductions, and it's incorrect to say that this was not a trial theory. The closing argument, the prosecutor referred to the exact same exhibits to show that the wires were sent via Wachovia Bank of the United States. That's at 49-14 of the 20 record. So sufficient evidence from the documents showed that the New York banks were involved and it was in foreign commerce. As to the, as to the, as to the sentencing, as to the, not the sentencing issue, as to the testimony of Mace Miller, Miller testified about his confrontation with Delgado at a restaurant where he said, why, how could, why did you divert this money that was supposed to go to FGG? And then Delgado said, well, the power of attorney gives me that right. And then in further direct testimony, received without objection, Miller was asked if the power of attorney contains any language authorizing Delgado to change the account of FGG's payments. And Miller answered, in my mind, it does not. So at this point at the direct testimony, there's no mention of Mexican law or Mexico. It was defense counsel who first mentions Mexico in a cross-examination. She says, quote, I guess that there are standard terms in the power of attorney that are effective in Mexico, unquote. And then she goes through the paragraphs on page four saying that the powers were very broad and the same as the rights of the owner. And then on redirect, the prosecutor, this is the basis for this issue, the prosecutor read from the power of attorney, which just recited that the paragraphs on page four were quoted from the Mexican civil code. So. Well, what about this wording of the judge that, you know, you can tell us how you see it as a lawyer? Does that give the jury the sense that this is an expert testimony? Well, I think he wasn't, when you look at the exact testimony, he wasn't interpreting the document through the lens of Mexican law. He was interpreting, he was just saying what the plain language of the document meant. Was he just saying you can't use a power of attorney to just take the money and run? Sure, yes. I mean. Yes. Wasn't that the essence of what he was saying? Exactly. He didn't say it that way, but. Yeah, and you, there were no paragraphs. I don't know about here, but fundamental principle of law. I would think that it would be unlikely any country would say that's what a power of attorney is, a person to whom you have the fiduciary duties, money, and just keep it. Steal from the fiduciary, no. Not only that, also, even if you just look at the terms there, one of the last terms is he's got the power of the owner, but then he has the power to defend the rights of the owner, to defend the rights of the owner. Stealing the owner's money is not defending the rights of the owner. I mean, if this had been a case where he had just created sort of a trust-like account so that the CEO wouldn't be stealing money himself and so that he could pay things and whatever out of that that were relevant to the company, I don't think we'd be here, right? Y'all would probably not have prosecuted something where he was setting up a strange account. Do that, then you say something about it. He kept it secret. The only way they ever found out about the money going to the offshore account was when he eventually paid money to FGG, and then they could see that it was from the Skippings-Rutley account. But he was using that account for himself. He was using that account for himself. That's the problem. It's not some real deep technical issue about you didn't word it quite right, you didn't put your initials on this one page. It's you kept the money, and there was nothing that authorized that. And the best exhibit on that is Government's Exhibit 2 showing all the disbursements from the account. And so if counsel was the first to ask about Mexican law, and so the principle is that it opened the door to those questions, and that if it was air as expert testimony, it was invited air as about Mexican law because the defense was the first to raise that. And then as to harm, just as to the evidence of the competing views of the scope of the power of attorney was presented without objection. They were part of the facts of the case. The jury already knew that in-house counsel Miller thought that the power of attorney didn't authorize Delgado's action, and outside counsel Delgado adamantly thought he did. And this was just, it was set up there as a matter of fact. And then in closing argument, I want to make clear, the government didn't refer to Miller by name. And it was the same argument that the language, notwithstanding whatever the language came from, the language of the memorandum of understanding and the language of the power of attorney didn't give Delgado the power to change the account and then to use the money for himself. I think that's all I have, Your Honor. Okay. All right. Thank you. Thank you very much. Unless the court has questions, I do not have any rebuttal. Okay. Thank you so much. We appreciate both sides' arguments, and the case is now under submission.